UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| MICHAEL PHILLIPS, : | |
|     Plaintiff, : | |
| : | |
| v. : | C.A. No. 3:20-cv-658 |
| : | |
| MEGA CONCRETE : | |
| CONSTRUCTION, LLC, : | |
| : | |
| CONNIE NOBLE, : | |
| : | |
| ROBERT GALLAGHER, : | |
| : | |
| CLASSIC CUSTOM HOMES OF : | |
| WAUNAKEE, INC., : | |
| : | |
| BRYAN SIPPLE, : | |
| : | |
| PRECISION CARPENTRY, LLC, and : | |
| : | |
| JEFF HARIU, : | |
|     Defendants. : | |

## COMPLAINT

1. Plaintiff Michael Phillips ("Plaintiff") brings this action under Section 1981 of the Civil Rights Act of 1866, 42 U.S.C. § 1981, *et seq. as amended*, and Wisconsin tort law for declaratory judgment, monetary damages, attorney fees, and other appropriate relief.

### I.  NATURE OF THE CASE

2. Plaintiff Michael Phillips is a black, African American, self-employed carpenter who worked for and with Defendants from March 2018 until June 2019, when he was blackballed by Defendants because he objected when Defendant Robert Gallagher, a foreman employed by Defendant contractor Mega Concrete, called him a "fucking nigger" and verbally assaulted him with racial epithets. When Plaintiff attempted to avail himself of certain civil rights laws, Defendants acted to deprive Plaintiff of valuable economic opportunities.

1

## II. JURISDICTION AND VENUE

3. This court has jurisdiction under 28 U.S.C. §§ 1331 and 1343. Plaintiff alleges racial discrimination and related retaliation in violation of 42 U.S.C. § 1981. The Court has supplemental jurisdiction over Plaintiff's state law claims under 28 U.S.C. § 1367.

4. Venue is proper in this district under 28 U.S.C. § 1391(a) because a substantial part of the events or omissions giving rise to this action occurred in this judicial district.

## III. PARTIES

5. Plaintiff Michael Phillips is an individual resident of the City of Madison, County of Dane, State of Wisconsin. He is Black and African American. At all relevant times, Plaintiff was a self-employed carpenter.

6. Defendant Mega Concrete Construction, LLC ("Mega Concrete") is a Wisconsin limited liability company with a principal place of business/registered agent address of 7190 Baxter Road, Arena, WI 53503.

7. Defendant Connie Noble is an individual residing in the Western District of Wisconsin. At all relevant times is, Noble was a Member and Manager of Mega Concrete. Noble is named in her individual and official capacity.

8. Defendant Robert Gallagher ("Gallagher") is an individual residing in the Western District of Wisconsin. At all relevant times, Gallagher was a supervisor, agent, and employee of Mega Concrete.

9. Defendant Classic Custom Homes of Waunakee, Inc. ("Classic") is a Wisconsin corporation. It has a principal place of business of 401 North Century Avenue, Waunakee, WI 53597 and a registered agent address of 318 South Main Street, #12, Blanchardville, WI 53516.

10. Defendant Bryan Sipple ("Sipple") is an individual resident of the Village of

Waunakee, County of Dane, State of Wisconsin. At all relevant times, Sipple is the Chief Operating Officer ("COO") of Classic. Sipple is named in his individual and official capacity.

11. Defendant Precision Carpentry, LLC ("Precision") is a Wisconsin limited liability company. It has a principal place of business of 312 East Main Street, Waunakee, WI 53597 and a registered agent address of 312 East Main Street, Unit A, Waunakee, WI 53597.

12. Defendant Jeffrey Hariu ("Hariu") is an individual resident of the Village of Waunakee, County of Dane, State of Wisconsin, and at all relevant times, President of Precision. Hariu is named in his individual and official capacity.

## IV. FACTUAL BACKGROUND

13. From about March 2018 to September 2019, Plaintiff was party to an employment contract with Defendant Precision. At all relevant times, Plaintiff furnished Precision with services, including consultation, site supervision, and skilled labor, helping it complete construction projects. Precision paid Plaintiff $26.50 per hour for his services.

14. Defendant Classic constructs residential and commercial buildings in the Western District of Wisconsin. Classic regularly hires contractors to complete different aspects of its projects.

15. At all relevant times, Classic regularly hired Precision to construct buildings. In turn, Precision employed Plaintiff to complete Classic-contracted jobs.

16. At all relevant times, Classic hired Mega Concrete to pour concrete foundations at its job sites.

17. Prior to March 2018, Classic hired Precision to build condominiums at a site in DeForest, Wisconsin, located within the Western District of Wisconsin (hereafter, the "DeForest Site"). Plaintiff performed services on behalf of Precision, and thus, as a subcontractor for

3

Classic, at the DeForest Site.

18. Classic was aware of the nature of Precision's contractual relationship with Plaintiff. Plaintiff previously worked, on behalf of Precision, as a subcontractor for Classic on several other projects.

19. In addition to hiring Plaintiff for his above-described services, Classic hired Mega Concrete to pour concrete foundations at the DeForest Site.

20. Precision, Plaintiff, and Mega Concrete worked simultaneously at the DeForest Site from about May 2018 to June 2018.

21. **On or about May 30, 2018**, at around 7:00 A.M., Plaintiff and other Precision workers were setting up for the day. A vehicle pulled up, parking nearby the worksite. Defendant Robert Gallagher, Mega Concrete's foreman and supervisor in charge at the DeForest Site, and two other Mega Concrete workers, exited the vehicle.

22. Gallagher became aware that one or more Precision worker(s) left project materials and tools — upon information and belief, several 2"X4"s and a level – in what Gallagher perceived as Mega Concrete's area. Gallagher walked over to the Precision workers who were present and began yelling and swearing at them. Gallagher demanded that the Precision workers "move the fucking shit," and collectively referred to them as "idiots."

23. Gallagher's words caused tension and elicited heated responses from the Precision workers, some of whom verbally responded in kind, by yelling and swearing.

### V.   DEFENDANTS' RACIST AND RETALIATORY CONDUCT

24. Upon observing the above, Plaintiff, who was working atop a ladder at the time, climbed down, approached the confrontation, and attempted to defuse the tension. Plaintiff stated to Gallagher, "we can talk to each other respectfully like adults if there are issues, there's no

4

need for this language." Plaintiff also apologized for the equipment being in Gallagher's way.

25. Plaintiff was unable to calm Gallagher down. Gallagher continued yelling and swearing about Precision workers leaving materials and tools in his way. In the ensuing exchange, Gallagher repeatedly called Plaintiff a "Nigger," openly directing the racial epithet at Plaintiff in front of all the workers present at the DeForest Site. Gallagher yelled at Plaintiff, "***You ain't nothing but a fuckin nigger***," "***What the fuck is going on, Nigger?***" and "***Go back to where you belong, you're not wanted here.***"

26. Of the approximately twelve (12) Precision and Mega Concrete workers present, all except two (2) – Plaintiff and another Precision worker who is Black – were/are White.

27. Plaintiff was shocked and outraged by Gallagher's use of derogatory racial slurs. When Plaintiff incredulously asked him to repeat what he had said, Gallagher argued that his use of the word "Nigger" was acceptable because "You guys say it all the time [in rap music,] why can't I?"

28. By "you guys" Gallagher was referring to black people and/or African Americans.

29. Because Gallagher called Plaintiff a "Nigger," appeared angry, and stepped towards Plaintiff, Plaintiff felt physically threatened by Gallagher.

30. Plaintiff is thin and approximately 5'9." Gallagher is several inches taller and approximately thirty (30) to forty (40) pounds heavier than Plaintiff. Fearing a physical attack may follow the verbal assault, Plaintiff picked up a nearby 2"X4" for defense. The onlookers separated the two men. Gallagher and Plaintiff did not make physical contact with one another.

31. A Mega Concrete employee who witnessed the incident approached Plaintiff and gave him the phone number of Mega Concrete's manager, Defendant Connie Noble. Plaintiff called Noble and reported the incident.

32. Noble reported to the DeForest Site several hours later and spoke with Plaintiff. Noble asked Plaintiff to walk with her to where Gallagher was working so that Gallagher could apologize to him – signaling that, while she found Plaintiff's report credible, the issue was a minor spat that required no substantive investigation or disciplinary action.

33. Gallagher refused to apologize to Plaintiff. Instead, Gallagher stated, in Noble's presence, "***Fuck that Nigger. How are you going to get upset***?" and repeated his justification for his comments, stating "***You people call each other Niggers all the time.***" By "you people," Gallagher was again referring to Black people and/or African Americans.

34. Noble said nothing to challenge or reprimand Gallagher's use of the racial slur and did not, even temporarily, remove Gallagher from his work. By failing to so act, Noble sanctioned and condoned Gallagher's use of racial slurs in the workplace.

35. Gallagher's conduct was expressly motivated by the fact that Plaintiff is Black, and was intended to humiliate, demean, and degrade Plaintiff based on his race.

36. Gallagher, a Mega Concrete supervisor, directed the unambiguously racial epithet "Nigger" at Plaintiff in front of his subordinates and fellow contractors (i.e., Precision). By referring to Plaintiff as "you people", "you guys" and "they" [i.e., "*they* call each other that in rap music all the time],", Gallagher explicitly distinguished Plaintiff's Black race from his own, White race. After attacking his race, Gallagher explicitly told Plaintiff that he did not belong and was "not wanted" at the DeForest Site.

37. Gallagher repeatedly called Plaintiff "Nigger" with the specific intent to harass, intimidate, or humiliate Plaintiff because of his race, or knew his repeated use of the slur was reasonably likely to harass, intimidate, or humiliate Plaintiff because of his race.

38. Gallagher subjected Plaintiff to severe, physically threatening, and humiliating

conduct, which created a racially abusive working environment that altered the conditions of Plaintiff's employment and substantially interfered with his ability to perform his job duties.

39. Plaintiff did not welcome or consent to Gallagher's conduct, and was humiliated, intimidated, and injured by it.

40. Noble and Mega Concrete deliberately refused to rectify the incident of racial harassment created by its supervisor. Mega Concrete failed to remove Gallagher from the job site, even though its manager, Noble, heard and actually observed him call Plaintiff the racist and *per se* injurious slur in her presence.

41. Rather than address the injury and threat posed by Gallagher's conduct, Noble decided, in the interest of finishing the project and maximizing her company's profits, that it was more important to leave Gallagher in charge as the DeForest Site supervisor.

42. Noble and/or Mega Concrete continually employed Gallagher at the Deforest Site for approximately four (4) days after the incident, and through the end of the job, despite knowing that he would continue to work there in Plaintiff's vicinity during that time.

43. Plaintiff suffered fearfulness, anxiety, and mental distress due to Gallagher's continued presence at the DeForest Site. In response to his inquiry, Noble told Plaintiff that Mega Concrete's reason for not removing Gallagher from the DeForest Site was that the company "had a project that it needed to finish."

44. Mega Concrete and/or Noble failed to terminate Gallagher for at **least three (3) weeks** following his racist assault of Plaintiff, assigning him to at least one (1) other job thereafter.

## VI.    PLAINTIFF'S PROTECTED ACTIVITY AND DEFENDANTS' RETALIATION

45. On June 4, 2018, Plaintiff filed a *pro se* discrimination complaint against Mega

Concrete with the Madison Equal Opportunities Commission, who transferred the case to the Wisconsin Department of Workforce Development, Equal Rights Division ("ERD"). Plaintiff's complaint was cross-filed with the Equal Employment Opportunities Commission.

46.     ERD assigned the case to an Administrative Law Judge. The parties appeared telephonically for a pre-hearing conference on April 29, 2019. Both parties thereafter retained counsel.

47.     On May 21, 2019, Plaintiff's counsel, Patrick O'Connor, filed a Notice of Appearance in the ERD action, which he emailed to Noble and her counsel that same day.

48.     On or about May 21, 2019, Noble and/or Mega Concrete advised Defendant Classic's COO, Defendant Bryan Sipple, that Plaintiff obtained counsel in his discrimination case against Mega Concrete.

49.     On or about May 21, 2019, Sipple advised Defendant Jeffrey Hariu, Defendant Precision's President, that **Classic would no longer permit Plaintiff** on Classic job sites. During their conversation(s), Sipple threatened to terminate Classic's business relationship with Precision if Precision continued to employ Plaintiff on Classic jobs.

50.     On the morning of May 22, 2019, Hariu approached Plaintiff—who was, at that time, working a non-Classic job with Precision—and began discussing Plaintiff's discrimination complaint. Hariu asked Plaintiff, "What's this going on with Mega Concrete?", and "***Mike, are you serious? Who files a lawsuit***?" Hariu advised Plaintiff that he was "...going to lose money over this." When Plaintiff asked Hariu to clarify what he meant, Hariu stated, "Well, we all do business together."

51.     Hariu advised Plaintiff that he could no longer work on Classic jobs. When Plaintiff asked why, Hariu responded, "because you are suing someone." At the time of the

conversation, Precision's upcoming project was a Classic-contracted job.

52.    On May 23, 2019, Plaintiff asked Hariu to clarify why he could not work the next Classic job. Hariu repeated that Sipple told him that Classic would terminate its contract with Precision if Precision continued employing Plaintiff on Classic projects.

53.    On June 11, 2019, Plaintiff, through counsel, withdrew his ERD complaint and requested a right to sue letter from the EEOC. On July 11, 2019, the EEOC terminated its processing of the charge and issued Plaintiff a right to sue letter.

54.    On June 17, 2019, Hariu again stated that Plaintiff could not work on the next Classic project "because [Plaintiff] is suing one of Classic's contractors."

55.    Because of Sipple's threat and Hariu's acquiescence to the same, Plaintiff was barred from working approximately fifteen (15) hours that he would have otherwise worked:

  (a) On June 26, 2019, Hariu sent Plaintiff home six (6) hours early from a non-Classic project that was winding down, as he began to send Precision employees to the new Classic project that was starting at that time; and

  (b) On June 27, 2019, Plaintiff was deprived of one full day, or approximately nine (9) hours of work that he would have otherwise performed.

Accordingly, Plaintiff was deprived of approximately $397.50 of compensation that he would have otherwise received (i.e., $26.50 X 15 hours) but for Defendants' retaliatory interference.

56.    Although Hariu and Precision thereafter assigned non-Classic work to Plaintiff, Plaintiff nevertheless suffered an adverse employment action because Precision physically and geographically separated him from his co-workers and barred him from certain job sites as a condition of continued employment.

57.    Sipple, Classic, Hariu, and Precision's exclusionary, discriminatory, and retaliatory actions:

  (a) substantially interfered with and impaired Plaintiff's existing contractual

relationship with Precision, culminating in its termination in September 2019;

(b) caused Plaintiff to suffer psychological harm; and

(c) irreparably damaged Plaintiff's reputation and career prospects.

58. Sipple, Classic, Hariu, and Precision's actions were willful and/or taken in reckless disregard of Plaintiff's civil and/or contractual rights. Specifically, Defendants took these actions to punish Plaintiff for attempting to enforce/enforcing his civil rights.

## VII. CLAIMS FOR RELIEF

### COUNT ONE: Hostile Environment/Interference With Contract In Violation of 42 U.S.C. § 1981
(Against Defendants Gallagher, Noble, and Mega Concrete)

59. Plaintiff adopts, realleges, and incorporates all previous paragraphs.

60. Section 1981 of Title 42 of the United States Code provides

> All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

42 U.S.C. § 1981(a). The term "make and enforce contracts" as used in 42 U.S.C. § 1981 includes "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C § 1981(b).

61. In violation of 42 U.S.C. § 1981, Defendants Gallagher, Noble, and Mega Concrete interfered with and impaired Plaintiff's existing contract with Precision by creating and tolerating a hostile environment that discriminated against Plaintiff based on his race.

62. Gallagher's use of the unambiguously racial epithet "Nigger" in front of his

subordinates severely altered the terms and conditions of Plaintiff's employment, humiliated Plaintiff, and unreasonably interfered with Plaintiff's work performance by creating an intimidating, hostile, and offensive working environment that seriously affected his psychological well-being.

63. Gallagher's racial harassment, and Noble and Mega Concrete's failure to adequately remediate the hostile environment that it created, unreasonably interfered with and impaired Plaintiff's contractual relationship with Precision, and otherwise deprived Plaintiff of equal opportunities because of his race, in violation of 42 U.S.C. § 1981.

64. Gallagher, a supervisor for Mega Concrete, was acting within the scope and course of his employment at the time he directed racial epithets at Plaintiff. Specifically, Gallagher started yelling at the Precision workers – beginning the rant that he ended by calling Plaintiff the unambiguously racial epithet – after he learned that they left materials and tools in a location that apparently impeded Mega Concrete's work at the DeForest Site.

65. Noble and Mega Concrete were aware of Gallagher's racial harassment and victimization of Plaintiff. Plaintiff complained to Noble about Gallagher's discriminatory treatment, and Noble herself witnessed Gallagher attack Plaintiff with a racial slur in front of her.

66. Noble and Mega Concrete deliberately failed and refused to investigate or otherwise rectify the situation. In so doing, they failed to prevent, remedy, and thus maintained and/or permitted, a racially intimidating, discriminatory, and hostile environment.

67. As a direct and proximate result of Gallagher, Noble, and Mega Concrete's discriminatory actions, Plaintiff has suffered severe emotional distress, mental anguish, humiliation, embarrassment, anxiety about his ability to support his family and future career prospects and earning capacity, and loss of enjoyment of life.

68. Plaintiff has suffered irreparable injury as a result of Gallagher, Noble, and Mega Concrete's actions and omissions, all of which violated 42 U.S.C. § 1981.

### COUNT TWO: Intentional Infliction of Emotional Distress
(Against Defendant Gallagher)

69. Plaintiff adopts, realleges, and incorporates all previous paragraphs.

70. By directing an unambiguously racial epithet at Plaintiff, Gallagher intended to cause Plaintiff emotional distress, or engaged in a course of conduct that he knew or should have known was substantially certain to cause Plaintiff emotional distress.

71. Gallagher engaged in conduct that reasonable persons would consider extreme and outrageous.

72. As a direct and proximate result of Gallagher's extreme and outrageous conduct, Plaintiff has suffered severe emotional and mental distress, humiliation, embarrassment, anxiety about his future career prospects and earning capacity, and loss of enjoyment of life.

### COUNT THREE: Negligent Infliction of Emotional Distress
(Against Defendants Noble and Mega Concrete)

73. Plaintiff adopts, realleges, and incorporates all previous paragraphs.

74. Defendants Noble and Mega Concrete were negligent with respect to remediating the racial injury that Gallagher inflicted upon Plaintiff.

75. Noble and Mega Concrete's decision to continually employ Gallagher at the DeForest Site, with knowledge that he attacked Plaintiff with racial slurs, caused Plaintiff to suffer severe emotional distress.

76. By failing to remove Gallagher from the racially hostile environment, Noble and Mega Concrete added insult to Plaintiff's injury. Allowing Gallagher to continue working in Plaintiff's presence for four (4) more days further humiliated Plaintiff, violated his dignity, and

caused him to worry that he might experience another attack during that time.

77. As a direct and proximate result of Noble and Mega Concrete's negligent conduct, Plaintiff has suffered severe and disabling emotional distress, mental anguish, humiliation, anxiety, fear, and loss of enjoyment of life.

### COUNT FOUR:  Negligent Training, Supervision, or Retention
(Against Defendant Mega Concrete)

78. Plaintiff adopts, realleges, and incorporates all previous paragraphs.

79. In Wisconsin, everyone has a duty of care to the whole world.

80. Mega Concrete owed a duty to adequately, properly, and sufficiently train and supervise its employees – especially supervisors that are likely to interact with third parties in the scope of performing their duties for the company – regarding the prevention of racial discrimination in the workplace. It owed a duty to third parties, including Plaintiff, to employ only persons who were minimally trained regarding workplace discrimination and harassment prevention, as well as a duty to refrain from employing persons with a known propensity to target, harass, and discriminate against other persons in the workplace because of their race.

81. A reasonable employer would foresee that an employee who is not sufficiently trained in the prevention of racial discrimination and harassment, or has demonstrated a propensity to engage in race discrimination on the job, could subject third parties to an unreasonable risk of harm – especially fellow contractors that belong to racial minority groups with whom the employee will likely interact.

82. Mega Concrete breached its duty to Plaintiff by acting unreasonably, failing to sufficiently train and supervise Gallagher regarding the avoidance and prevention of racially discriminatory conduct and harassment, and improperly retaining him.

83. Noble, who is a principal of Mega Concrete, was aware of Gallagher's propensity

to assault third-party contractors with harmful racial slurs while performing duties for Mega Concrete. Noble observed Gallagher attack Plaintiff with a racial epithet while investigating Plaintiff's complaint that Gallagher did so earlier. Accordingly, Mega Concrete knew that Gallagher was unfit for employment as foreman at the DeForest Site.

84. Mega Concrete had knowledge or reason to know of the severity of the injury that Gallagher inflicted upon Plaintiff, and that this injury would be exacerbated if it failed to take the minimally corrective action of removing Gallagher from Plaintiff's presence. An employer acting reasonably under the circumstances would have removed Gallagher from the job site immediately.

85. Mega Concrete failed to take appropriate remedial action proportionate to its knowledge of Gallagher's harmful, injurious actions. Mega Concrete decided to allow the hostile environment to continue for the remaining four (4) days that it took to finish its project at the DeForest Site, deeming it more economically expedient, at that stage, to leave Gallagher in charge as foreman.

86. Mega Concrete's decision to retain and continually employ Gallagher within Plaintiff's presence and vicinity was negligent, and a breach of its duty to Plaintiff to exercise reasonable caution in the training, supervision, and retention of its employees. By allowing Gallagher to continue working in Plaintiff's presence after he victimized Plaintiff, Mega Concrete tolerated, ignored, and rewarded Gallagher's racist behavior while minimizing Plaintiff's injury and devaluing his personhood.

87. Gallagher's wrongful conduct, as alleged herein, was a substantial factor in producing Plaintiff's injuries.

88. Mega Concrete's failure to exercise reasonable diligence and due care in the

training, supervision, and retention of Gallagher, was a substantial cause of the tortious, negligent, or otherwise wrongful acts of Gallagher that caused Plaintiff's injuries.

89. As a direct and proximate result of Noble and Mega Concrete's negligent acts and omissions, Plaintiff has suffered emotional pain and suffering, mental anguish, humiliation, embarrassment, anxiety, fear, and loss of enjoyment of life.

### COUNT FIVE: Retaliation In Violation of 42 U.S.C. § 1981
(Against Defendants Sipple, Classic, Hariu, and Precision)

90. Plaintiff adopts, realleges, and incorporates all previous paragraphs.

91. Section 1981 of Title 42 of the United States Code guarantees Black citizens "the same right…to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens..."

92. Plaintiff's filing of the ERD Complaint, in which he alleged that Mega Concrete subjected him to race discrimination at the DeForest Site, as well as his participation/retention of counsel in the ERD proceeding, constitutes protected activity under 42 U.S.C. § 1981.

93. Sipple, Classic, Hariu, and Precision were aware of Plaintiff's participation in protected activity.

94. In violation of 42 U.S.C. § 1981, because of and as retaliation for Plaintiff's participation in protected activity, Sipple, Classic, Hariu, and Precision interfered with and impaired Plaintiff's right to enforce his existing contract with Precision and frustrated his opportunity to make and enforce additional contracts.

95. The effect of the above discriminatory and retaliatory actions by Sipple, Classic, Hariu, and Precision unreasonably interfered with and impaired Plaintiff's right to make and enforce contracts, and otherwise deprived Plaintiff of equal employment opportunities because of his race, in violation of 42 U.S.C. § 1981.

96. As a direct and proximate result of Sipple, Classic, Hariu, and Precision's acts and omissions, Plaintiff suffered lost wages and compensation, emotional pain and suffering, mental anguish, humiliation, anxiety about his ability to support his family and his future career prospects and earning capacity, and loss of enjoyment of life.

97. Plaintiff has suffered irreparable injury from the foregoing actions, all of which violated 42 U.S.C. § 1981.

### COUNT SIX:  Tortious Interference With Contract
(Against Defendants Sipple and Classic)

98. Plaintiff adopts, realleges, and incorporates all previous paragraphs.

99. At all relevant times, Plaintiff had an existing contractual relationship with Precision.

100. Sipple and Classic intentionally interfered with Plaintiff's existing contract with Precision.

101. Sipple and Classic were not justified or privileged to interfere with Plaintiff's contract.

102. As a direct and proximate result of Sipple and Classic's interference, Plaintiff suffered lost wages and compensation, emotional pain and suffering, mental anguish, humiliation, anxiety about his ability to support his family and his future career prospects and earning capacity, and loss of enjoyment of life.

### REQUEST FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests that this Honorable Court:

1. Enter declaratory judgment that Defendants engaged in intentional race discrimination and retaliation, in violation of Plaintiff's rights under 42 U.S.C. § 1981;

2. Award Plaintiff lost compensation, as well as damages for emotional pain and

suffering, mental anguish, humiliation and anxiety, career losses, dignitary and reputational harm, in an amount to be proven at trial;

3. Award Plaintiff punitive damages, in an amount to be proven at trial;

4. Award Plaintiff reasonable attorney fees, litigation expenses, and costs of suit; and

5. Order all such other relief as this Court deems just and equitable.

## JURY TRIAL DEMAND

Plaintiff prays trial by jury on all issues triable by right to a jury.

Respectfully submitted,

Attorney for Plaintiff,
Michael Phillips,

Dated: July 17, 2020

*s/ Patrick O'Connor*
Patrick O'Connor (WI SBN #1094992)
d/b/a O'Connor Law Firm
P.O. Box 7757
Madison, WI 53707
(608) 203-6349
pmo@patoconnorlaw.com